UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------)
                                                  )
            JIANQIAO LU,                          )
                                                  )        7:22-CV-9715 (NSR)
        Plaintiff-Petitioner,                     )
                                                  )
                  v.                              )
                                                  )
        MIRIAM E. ROCAH,                          )
        in her official capacity as              )
District Attorney for Westchester County;         )
                                                  )
        CATALINA BLANCO BUITRAGO,                 )
        in her official capacity as              )
        Assistant District Attorney              )
          for Westchester County;                 )
                                                  )
        LETITIA A. JAMES,                         )
        in her official capacity as              )
Attorney General of the State of New York;        )
                                                  )
        KATHY C. HOCHUL,                          )
        in her official capacity as              )
     Governor of the State of New York;           )
                                                  )
        JOSEPH K. SPANO,                          )
        in his official capacity as              )
Commissioner of the Westchester County            )
        Department of Correction,                 )
                                                  )
        Defendants-Respondents.                   )
                                                  )
-------------------------------------------------)



RECEIVED
MAR 3 1 2023
PRO SE OFFICE

AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

***
IMMEDIATE RELIEF SOUGHT
***

## INTRODUCTION

Guns outnumber people in the United States.[1]  Of the 400 million civilian-held firearms in this country, less than 0.3% are registered.[2] It is public record that while many U.S. residents do not gun a gun, others collect multiple firearms--especially those who regularly participate in the shooting sports. "American Rifleman," a publication that promotes firearm ownership and the Second Amendment, has more paid subscribers than "Time" or "The New Yorker."[3]

It is against this tableau that New York's statutory scheme criminalizing the mere possession of multiple firearms truly defies law and logic. The scheme prescribes severe punishment--sending people to prison for up to twenty-five years--for what is not a crime but a way of life in the vast majority of U.S. states. With this scheme and other amorphous gun laws, New Yorks seeks to advance its political agenda at the expense of the individual citizen's life, liberty, and property. That is not just illegal. It is also wrong.

Pro se Plaintiff-Petitioner Jianqiao Lu, who has been detained without bail for more than seventeen months because he kept sixteen firearms in his home for lawful self-protection and sporting purposes only, brings this hybrid habeas corpus and civil rights action under 28 U.S.C. Section 2241 and 42 U.S.C. Section 1983, challenging the constitutionality of the relevant sections of the New York Penal Law. He seeks declaratory and injunctive relief, and release from state custody.

---

1. See Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey (June 2018), https://www.smallarmssurvey.org/sites/default/files/resources/SAS-BP-Civilian-Firearms-Numbers.pdf.

2. See id.

3. Best-Selling U.S. Magazines 2022, The World Almanac and Book of Facts 2023, at 255 (published November 2022).

## PARTIES

1.      Plaintiff-Petitioner Jianqiao Lu ("Plaintiff" or "Mr. Lu") is currently detained pending trial by New York State in the custody of the Westchester County Department of Correction in Valhalla, New York. Mr. Lu is a citizen of the People's Republic of China, and is lawfully present in the United States.

2.      Defendant-Respondent Miriam E. Rocah ("DA Rocah") is named in her official capacity as the District Attorney for Westchester County. In this capacity, DA Rocah is the chief law enforcement officer of the County, and has final authority over how the New York Penal Law is interpreted and implemented in her jurisdiction.

3.      Defendant-Respondent Catalina Blanco Buitrago ("ADA Buitrago") is named in her official capacity as an Assistant District Attorney for Westchester County. In this capacity, ADA Buitrago is assigned to Plaintiff's state criminal case, and is actively prosecuting Plaintiff under the challenged sections of the New York Penal Law.

4.      Defendant-Respondent Letitia A. James ("AG James") is named in her official capacity as the Attorney General of the State of New York. In this capacity, AG James is the chief law enforcement officer of the State, and is responsible for advising state and local prosecutors and officials on questions of state and federal law.

5.      Defendant-Respondent Kathy C. Hochul ("Governor Hochul") is named in her official capacity as the Governor of the State of New York. In this capacity, Governor Hochul is the chief executive officer of the State, and is responsible for the faithful execution of state law.

6.      Defendant-Respondent Joseph K. Spano ("Commissioner Spano") is named in his official capacity as the Commissioner of the Westchester

County Department of Correction. In this capacity, Commissioner Spano currently has immediate custody over Plaintiff.

## JURISDICTION AND VENUE

7.     Plaintiff brings this action pursuant to 28 U.S.C. Section 2241(c)(3), because he is "in custody in violation of the Constitution or laws...of the United States." Plaintiff also asserts claims under 42 U.S.C. Section 1983 for violations of his federal constitutional rights by state actors.

8.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. Section 2241 (habeas corpus), 28 U.S.C. Section 1651 (All Writs Act), 28 U.S.C. Section 1343(a) (civil rights jurisdiction), and 28 U.S.C. Section 1331 (federal question jurisdiction). Authority to enter a declaratory judgment and to grant preliminary or permanent injunctive relief is provided under 28 U.S.C. Sections 2201, 2202, and Fed. R. Civ. P. 57, 65.

9.     This Court is the appropriate venue pursuant to 28 U.S.C. Section 1391(b)(2) because the events and omissions giving rise to this action occurred in the Southern District of New York.

## FACTUAL BACKGROUND

### The Arrest

10.    Mr. Lu was arrested on October 25, 2021 in Hastings-on-Hudson, New York, where he lived. The New York City Police Department ("NYPD") subsequently executed a search warrant--resulting from an investigation into Mr. Lu's alleged involvement in credit card fraud and identity theft--of his residence, of his three vehicles, and of his person.

11.     During the search, NYPD discovered and seized, <u>inter alia</u>, sixteen firearms, including eight handguns, seven modern sporting rifles, and one bolt-action rifle.

12.     The firearms were kept inside Mr. Lu's residence, with all of them unloaded and securely stored. No firearm was located in Mr. Lu's vehicles or on his person. No firearm was stolen, was a "ghost gun," had an altered or obliterated serial number, or had ever been used in a crime.

13.     Mr. Lu has no criminal history. Nor is he otherwise prohibited from possessing firearms by federal law, namely, <u>18 U.S.C. Section 922(g)</u>.

14.     Mr. Lu was arraigned on October 25, 2021 by Hastings-on-Hudson Village Judge Joseph A. DiSalvo, and was charged with criminal possession of a weapon in the first degree (<u>New York Penal Law ("NYPL") Section 265.04(2)</u>) and criminal possession of a weapon in the second degree (<u>NYPL Section 265.03(2)</u>). Mr. Lu was remanded to the Westchester County Jail ("WCJ"), and has been incarcerated there since.

**The American Journey**

15.     Mr. Lu first visited the United States in the summer of 2011 to participate in a youth summit at the United Nations Headquarters in New York City. Between August 2013 and June 2017, Mr. Lu attended Sarah Lawrence College in Bronxville, New York, where he was a recipient of the Dean's Scholarship and graduated with a 3.9 GPA. He was also selected to spend his junior year as an exchange student at the University of Oxford in the United Kingdom.

16.     Since mid-2017, Mr. Lu has worked as a college counselor, advising international students on how to gain admission to top U.S. universities. He is also a freelance photographer and ski instructor.

Mr. Lu frequently volunteers in the community, such as as a section leader at the New York City Pride March, and as a patient liaison at the Hospital for Special Surgery, also in New York City.

17.    Mr. Lu has always maintained a valid immigration status throughout his decade-long stay in the United States. He is currently awaiting adjudication of his political asylum application, submitted to the U.S. Citizenship and Immigration Services on July 9, 2019. This application is based on the Chinese government's persecution of Mr. Lu due to his LGBTQ+ activism. Mr. Lu is lawfully present in the U.S. See 8 U.S.C. Section 1158(a)(9)(B)(iii)(II).

18.    During the height of the COVID-19 pandemic, Asians in America were disproportionately targeted for racially motivated violence. In New York City alone, total hate crimes dropped by 38% overall but spiked by 800% where Asians or Pacific Islanders were the target.[4]

19.    In or about July 2020, Mr. Lu, an Asian man living in the New York Metropolitan Area, became increasingly apprehensive of anti-Asian violence and decided to arm himself for protection. However, to his astonishment, Mr. Lu was unable to purchase a handgun for self-protection because New York law prohibits non-U.S. citizens from possessing any dangerous weapon. See NYPL Section 265.01(5).

20.    With Asian hate still surging and no alternative to alleviate his fear, Mr. Lu purchased two handguns in the State of Maine in or about August 2020.

21.    Between August 2020 and May 2021, intending to better his knowledge in the safe and responsible handling of firearms, Mr. Lu

---

4. See Fact Sheet: Anti-Asian Prejudice, Center for the Study of Hate and Extremism, California State University San Bernardino (2021).

took a series of firearm-safety classes at the Sig Sauer Academy in Epping, New Hampshire. It was through this experience that Mr. Lu's initial desire to possess firearms for self-protection transformed into a deep enthusiasm in the shooting sports, which led to his eventual collection of sixteen firearms.

22.    Mr. Lu has a long, demonstrable history of indulging in his sporting pursuits. For example, while sixteen firearms were found in his home, Mr. Lu also kept no less than ten pairs of skis there. In fact, he had spent nearly 100 days on the slopes during the 2018-19 winter season. Similarly, in July 2021, Mr. Lu went skydiving for the first time--he fell in love with the sport, obtained license to fly solo, and made some 170 jumps in the following three months.

23.    Mr. Lu possessed his firearms for lawful self-protection and sporting purposes only.

### The Ongoing Prosecution

24.    It would be one thing if New York had even an iota of proof that Mr. Lu had possessed the firearms to commit a violent act, to further another crime, or to sell them illegally. It is something else altogether when New York continues to jail Mr. Lu in the face of clear and convincing evidence that he is merely a firearm enthusiast. The latter is not justice--it is tyranny. It sends the message that "you are not a citizen of a democracy but the subject of a carceral state, just waiting to be cataloged." Utah v. Streiff, 579 U.S. 232, 254 (2016) (Sotomayor, J., dissenting).

25.    Indeed, Mr. Lu's ongoing prosecution is animated by ad hominem bad faith and bias. On December 14, 2021, eager to clear his name, Mr. Lu sat down with ADA Buitrago and other law enforcement parties such as NYPD and Homeland Security Investigations in a proffer meeting,

where he willingly, truthfully, and completely answered all of the investigators' questions. Mr. Lu additionally provided the prosecution full access to his electronic devices and his email, bank, and social media accounts—he had nothing to hide. On March 8, 2022, Mr. Lu was produced for another proffer session at ADA Buitrago's request. Despite these good-faith efforts on Mr. Lu's part to cooperate with the authorities, DA Rocah's office continues to drive a bad-faith prosecution. Mr. Lu's utter lack of malicious intent or violent behavior in connection with his firearm possession does not deter DA Rocah from seeking not years, but over a decade, of imprisonment.

26.   DA Rocah is also biased, because the penalty recommended by her office—a twelve-year prison sentence, among other sanctions—is grossly disproportionate to Mr. Lu's purported offense. By contrast, in a highly publicized case, DA Rocah offered five years' probation to a criminal defendant who had possessed a cache of weapons with the immediate intent and opportunity to commit murder.[5]   Matthew Bonanno, a then plastic surgeon, was arrested in Tuckahoe, New York in August 2019 for threatening to kill his ex-wife and daughter while carrying a loaded handgun.[6]   A subsequent police search of Bonanno's car—which was parked on his ex-wife's driveway—revealed eight unlicensed, fully loaded firearms (including five "assault weapons"), numerous large-capacity magazines, thousands of rounds of ammunition, handcuffs, a stun gun, and other tactical gear.[7]   Bonanno purported to be a gun collector, and DA Rocah believed him.[8]   Perhaps Mr. Lu should purport to be a white doctor.

---

5. 6. 7. 8. See generally: Tuckahoe doctor Matthew Bonanno expected to plead guilty to gun charge, LoHud (June 7, 2021); What led to plastic surgeon Matthew Bonanno's gun arrest in Tuckahoe, LoHud (August 15, 2019) (URLs omitted, available upon request).

27.     On March 1, 2023, with plea negotiations at an impasse, DA Rocah filed a 113-count indictment against Mr. Lu in the Westchester County Supreme Court (Indictment No. Y010009022), which contains the following charges:

| # of Counts | NYPL Section | Charge |
|---|---|---|
| 1 | 265.04(2) | CPW1: ten or more firearms* |
| 1 | 265.03(2) | CPW2: five or more firearms |
| 1 | 265.02(5)(i) | CPW3: three or more firearms |
| 8 | 265.02(7) | CPW3: "assault weapon" |
| 86 | 265.02(8) | CPW3: large-capacity magazine |
| 16 | 265.01-b(1) | Crim. Poss. of a Firearm |

* CPW1 = Criminal Possession of a Weapon in the First Degree

28.     Mr. Lu's state criminal case is presently pending before Westchester County Supreme Court Justice Robert Neary. As of March 30, 2023, no court hearing of substance has occurred and no motion practice has begun. With no end in sight to the state proceeding, Mr. Lu continues to be detained without bail at WCJ, where harsh and dangerous conditions of confinement are creating great and imminent irreparable harm.

### The Jail Experience

29.     As a gay Chinese immigrant navigating the distorted and bizarre hierarchy of American prison culture, Mr. Lu simultaneously attracts serious physical and emotional abuse from the xenophobes, the homophobes, and the homosexual predators--all of whom are ubiquitous behind prison walls. In addition to enduring racial and homophobic slurs on a daily basis, Mr. Lu routinely experiences the preambles to

sexual assault, from leering to sexually agressive comments to outright threats. He is in acute and constant fear of, frankly, getting raped.

30.    This outsized risk for severe irreparable harm is compounded by the fact that the mere possession of multiple firearms is defined as a violent crime by the New York Penal Law. See NYPL Section 70.02(1). As this Court is aware, a prisoner's security classification--and consequently, his housing assignment--is largely dependent upon the seriousness of his offense. Because Mr. Lu is charged with a crime that, under New York law (see id.), is equivalent to first-degree manslaughter, he has been assigned an abnormally high security score at WCJ. As a result, Mr. Lu is more likely than a nonviolent offender to be housed with those who have a demonstrated history of violence or deviant sexual behavior.

31.    Moreover, the COVID-19 pandemic is still ravaging America's prisons and has made their conditions drastically worse than usual. Incarcerated individuals at WCJ--including Mr. Lu--continue to face the catastrophic health consequences of incessant COVID outbreaks and draconian quarantine measures. Mr. Lu contracted the coronavirus at WCJ in November 2021, and still suffers to this day a constellation of residual symptoms--also known as "long COVID"--such as brain fog and an altered sense of taste.

32.    Mr. Lu has undergone five rounds, or approximately sixty days, of medical quarantine at WCJ since October 2021. An euphemism for solitary confinement, prison quarantine inflicts unspeakable psychological trauma on incarcerated people. Without access to potable water, hot meals, or adequate medical care, WCJ residents under quarantine are confined in single cells for twenty-three hours a day.

This extreme form of social isolation has pushed Mr. Lu to the brink
of depression--he now requires frequent mental health intervention to
address quarantine-related symptoms.

33.     The pandemic notwithstanding, standard conditions in U.S. jails
and prisons shave years off life expectancy. One pre-COVID study
estimated that each year of incarceration shortened a person's future
life by two years.[9]   Another estimated a loss of five years of life
expectancy by age forty-five.[10]

### The Instant Action

34.     The American justice system is "not one in which the Government
may breach with impunity," and Due Process may "not be glued together
from broken pieces." Martinez v. McAleenan, 385 F.Supp.3d 349, 373
(S.D.N.Y. 2019) (Román, J.). Because Mr. Lu is being subjected to
perpetual detention for exercising a constitutionally protected
freedom, and because New York State is uninterested in and incapable
of fixing this mistake, he now sues in federal court to reclaim his
life, liberty, and pursuit of happiness.


### EXHAUSTION OF STATE-COURT REMEDIES

35.     The federal habeas statute that Plaintiff is suing under, 28
U.S.C. Section 2241, has no exhaustion requirement. Exhaustion is only
required where Congress specifically mandates it. McCarthy v. Madigan,
503 U.S. 140, 144 (1992). In all other instances, "sound judicial
discretion governs." Id. To the extent that federal courts have
required Section 2241 petitioners to exhaust state-court remedies,

---

9. S. Daza, The Consequences of Incarceration for Mortality in the
   United States, Demography, 57:577-598 (2020).

10. E. Patterson, The Dose-Response of Time Served in Prison on
    Mortality: New York State 1989-2003, Am. J. Public Health, 103:
    523-528 (2013).

that requirement is a judicial invention to accommodate the principles of federalism, and is subject to "a broad range of exceptions." <u>Bastek v. Fed. Crop Ins. Corp.</u>, 145 F.3d 90, 94 (2nd Cir. 1998).

36.     When the state court cannot and will not timely end irreparable constitutional harm, the federal court must. Plaintiff is suffering a state criminal proceeding that is permeated by undue delay and prejudice. He raises substantial federal constitutional questions that the state forum is demonstrably biased against. His ongoing detention under excessively punitive and potentially dangerous conditions poses imminent, catastrophic danger to his physical and mental health. Accordingly, state-court exhaustion would be futile and should be waived by this Court.


## YOUNGER ABSTENTION

37.     Similarly, federal abstention under <u>Younger v. Harris</u>, 401 U.S. 37 (1971), is unwarranted in this case. Born of the same judicial conceptions like equity, comity, and federalism that motivate the exhaustion doctrine, <u>Younger</u> abstention deprives the federal court of jurisdiction when certain conditions are met. However, this case does not fit that bill. First, even though there is an ongoing state criminal proceeding, that forum does not provide an adequate opportunity to adjudicate Plaintiff's federal constitutional claims. In addition to the prosecutorial bad faith and bias alleged above, New York's criminal justice apparatus is plagued by structural and systemic biases against the Second Amendment and those who support it. Put another way, the state-court forum in New York is complicit in furthering––and inherently incapable of repairing––the constitutional violations at issue. In this instance, federal abstention does not

advance federalism--it may well undermine federalism.

**38.**    Second, this case implicates a state statutory scheme that is flagrantly and patently unconstitutional in its entirety for all purposes. Specifically, New York imposes strict criminal liability, including up to twenty-five years of imprisonment, on the mere possession of multiple firearms by law-abiding citizens--an activity expressly protected by the Second Amendment. This scheme is historically unprecedented, and no analogous law currently exists in any other state or federally. To abstain despite New York's unchecked flouting of federal norms would be to flip _Younger_ on its head and into the territory of unreviewable state supremacy.

**39.**    Third, the untimely state proceeding in this case constitutes an extraordinary circumstance. Because Plaintiff is being held indefinitely without any substantive hearing under patently unconstitutional state law, his pretrial rights, including those preventing unlawful pretrial detention, cannot be vindicated post-trial. Because the state court does not afford any timely means to abate the great and immediate irreparable harm that Plaintiff faces, he must be allowed to raise and have adjudicated his claims in an adequate forum.

**40.**    Fourth, the relief that Plaintiff is requesting--a declaration from this Court that certain sections of the New York Penal Law are facially unconstitutional--is minimally intrusive to state-court functions. The issues before the Court are primarily legal, and not factual, in nature. Crucially, the instant case does not place this Court in the role of second-guessing factual findings by state-court judges (although there are none to be second-guessed at the moment), nor does it turn the federal court into a forum to litigate parallel

or duplicative pretrial motions that the state court has yet to decide.
It is under these circumstances that federalism concerns of needlessly
invading a state proceeding dissipates, and this Court's unflagging
duty to hear controversies rises.

## CHALLENGED STATUTES

41.   NYPL Section 265.04(2) provides: "a person is guilty of
criminal possession of a weapon in the first degree when such person
possesses ten or more firearms." This offense is a class B violent
felony that carries a mandatory determinate sentence between five and
twenty-five years. See NYPL Section 70.02.

42.   NYPL Section 265.03(2) provides: "a person is guilty of
criminal possession of a weapon in the second degree when such person
possesses five or more firearms." This offense is a class C violent
felony that carries a mandatory determinate sentence between three-
and-one-half and fifteen years. See NYPL Section 70.02.

43.   NYPL Section 265.02(5)(i) provides: "a person is guilty of
criminal possession of a weapon in the third degree when such person
possesses three or more firearms." This offense is a class D violent
felony that carries a mandatory determinate sentence between two and
seven years. See NYPL Section 70.02.

44.   NYPL Section 265.02(7) provides: "a person is guilty of
criminal possession of a weapon in the third degree when such person
possesses an assault weapon." This offense is a class D violent felony
that carries a mandatory determinate sentence between two and seven
years. See NYPL Section 70.02.

45.   NYPL Section 265.02(8) provides: "a person is guilty of
criminal possession of a weapon in the third degree when such person

possesses a large capacity ammunition feeding device." This offense is a class D violent felony that carries a mandatory determinate sentence between two and seven years. See NYPL Section 70.02.

46.   NYPL Section 265.01(5) provides: "a person is guilty of criminal possession of a weapon in the fourth degree when he possesses any dangerous or deadly weapon and is not a citizen of the United States." This offense is a class A misdemeanor.


## CLAIMS FOR RELIEF

47.   Plaintiff attacks the constitutionality of the above statutes via two different procedural mechanisms. First, federal habeas corpus is the appropriate vehicle to challenge the statutes that Plaintiff has been criminally indicted under, because a declaration that they are unconstitutional "would necessarily demonstrate the invalidity of confinement or its duration." Wilkinson v. Dotson, 544 U.S. 74, 82 (2005). Those statutes include NYPL Sections 265.04(2), 265.03(2), 265.02(5)(i), 265.02(7), 265.02(8), and their corresponding sentencing provisions within NYPL Section 70.02. Second, NYPL Section 265.01(5) is properly challenged via Section 1983 because Plaintiff has not been charged--but faces future prosecution--under this statute. Plaintiff's claims for relief are summarized in the following table:

| NYPL Section | 265.04(2) | 265.03(2) | 265.02(5)(i) | 265.02(7) | 265.02(8) | 265.01(5) |
|---|---|---|---|---|---|---|
| Felony Class[1] | B | C | D | D | D | Misd. |
| Sentence[2] | 5-25 | 3.5-15 | 2-7 | 2-7 | 2-7 | / |
| Vehicle | 2241 | 2241 | 2241 | 2241 | 2241 | 1983 |
| Argument: | | | | | | |
| 2A[3] | X | X | X | X | X | X |
| 14A (Mens Rea)[4] | X | X | X | X | X | |
| 14A (Vagueness) | X | X | X | X | X | |
| 14A (Equal Pro.) | | | | | | X |

1. See NYPL Section 70.02(1).

2. Mandatory sentencing range in years; see NYPL Section 70.02(3).

3. Second Amendment.

4. Fourteenth Amendment.

15

## COUNT I:

### NYPL SECTIONS 265.04(2), 265.03(2), 265.02(5)(i) AND THEIR CORRESPONDING SENTENCING PROVISIONS WITHIN NYPL SECTION 70.02 VIOLATE THE SECOND AMENDMENT

**48.**    Plaintiff repeats and re-alleges paragraphs 1 through 47 as if set in full.

**49.**    The Second Amendment to the United States Constitution states: "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II.

**50.**    In New York State Rifle and Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022), the Supreme Court expressly rejected the Second Circuit's sweeping deference to New York's nebulous gun laws, ruling that means-end scrutiny no longer applies in the Second Amendment context. Instead, Bruen pronounced a new standard of review relying exclusively on text and history when evaluating whether a challenged firearm regulation violates the Second Amendment.

**51.**    Specifically, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. at 2126, 2129-30. "To justify its regulation of firearms under the Second Amendment, the government may not simply posit that the regulation promotes an important interest; rather, the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." Id. at 2126.

**52.**    The plain text of the Second Amendment enshrines a "right" (not merely a privilege or suggestion subject to legislative revision or retraction) that belongs to "the people" (not merely to some select few, with historical exceptions only in cases of demonstrated and dangerous criminal disposition or lack of capacity) to "keep and bear

Arms" (not merely one firearm, but in the plural).

53.     By making the keeping and bearing of arms a "right," the Second Amendment relieves "the people" of any obligation to justify their exercise of that right. By definition, a person exercising a right does not need permission from the state.

54.     NYPL Sections 265.04(2), 265.03(2), 265.02(5)(i) and their corresponding sentencing provisions within NYPL Section 70.02 violate the Second Amendment's plain text because this statutory scheme denies the people the right to keep and bear multiple firearms.

55.     New York's demotion of the right to keep arms has no more grounding in history and tradition than in constitutional text. New York's scheme is one of a kind--no analogous historical or current legislation exists in any other state or federally that restricts the number of normal, widely used firearms one can possess.

56.     The Supreme Court was clear in Bruen, 142 S.Ct. at 2131, that "when a challenged firearm regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."

57.     There is no empirical evidence to suggest that New York's scheme criminalizing the mere possession of multiple firearms has played any role in deterring gun violence in urban areas. Paradoxically, neighboring states like New Jersey and Massachusetts-- both densely populated but neither restricting firearm possession by quantity--have seen lower firearm-related mortality rates (5 and 3.7 per 100,000 residents, respectively, in 2020) than New York's (5.3).[11]

---

11. See next page.

Moreover, in Massachusetts, the foremost anti-gun state in the U.S. by some measures, the possession of firearms in one's home--irrespective of licensing status or quantity--is not a crime. See Ma. General Laws 269 Section 10(a)(1).

58.    Accordingly, under any faithful reading of text, history, tradition, and Supreme Court jurisprudence, the Second Amendment plainly prohibits New York from criminalizing the mere possession of multiple firearms, let alone imposing double-digit prison sentences on the exercise of a fundamental constitutional right.

59.    NYPL Sections 265.04(2), 265.03(2), 265.02(5)(i) and their corresponding sentencing provisions within NYPL Section 70.02 are "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply [them]." Younger, 401 U.S. at 53-54 (citation omitted).

## COUNT II:

### NYPL SECTIONS 265.02(7), 265.02(8) AND THEIR CORRESPONDING SENTENCING PROVISIONS WITHIN NYPL SECTION 70.02 VIOLATE THE SECOND AMENDMENT

60.    Plaintiff repeats and re-alleges paragraphs 1 through 59 as if set in full.

61.    The Second Amendment is not a second-class guarantee buried in the fine print at the bottom of the Constitution. Despite New York's apparent legislative policy preferences and animus toward Second Amendment rights (and by extension, those who would lawfully seek to assert and exercise them), "the enshrinement of constitutional rights

---

11. Stats of the States - Firearm Mortality, National Center for
    Health Statistics, CDC (2020), https://www.cdc.gov/nchs/pressroom/
    sosmap/firearm_mortality/firearm.htm.

necessarily takes certain policy choices off the table." District of Columbia v. Heller, 554 U.S. 570, 636 (2008).

62.    New York has had a lengthy struggle with its ongoing attempt to brand and restrict normal firearms that are in common use for lawful purposes as "assault weapons." See NYPL Section 265.00(22). The term "assault weapon" is a politically concocted, pejorative epithet designed to suggest that there is an inherently unlawful or illegitimate basis for owning otherwise normal firearms protected by the Second Amendment. This very term, and New York's enforcement of it, violate the fundamental, individual right to keep and bear arms.

63.    To be sure, the so-called "assault weapons" are not bazookas, howitzers, or machineguns that are designed exclusively for military use. Those arms are dangerous and fall outside the Second Amendment's protection. Instead, the banned arms by New York are fairly ordinary, popular, and modern rifles. Over the last three decades, nearly twenty million of those modern sporting rifles have been manufactured in or imported to the United States. Miller v. Bonta, 542 F.Supp.3d 1009, 1022 (S.D.Ca. 2021). Modern rifles are twice as popular as Ford F-150 pickup trucks. Id. "Roughly five million Americans own AR-style semiautomatic rifles." Friedman v. City of Highland Park, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of certiorari).

64.    New York politicians and the news media paint a dire picture that the nation is awash with murderous AR-15 assault rifles. The facts, however, do not support this hyperbole, and facts matter. For example, according to FBI statistics for 2019 (the most recent year with data), murder by knife attack occurred **forty** times more often than murder by some type of rifle--not necessarily an AR-15--in New

York State.[12]   A New Yorker is **fifteen** times more likely to be murdered by an attacker's bare hands, fists, or feet, than by his rifle.[13]   To prevent a grand total of **three** murders by rifle per year,[14] New York prefers to ban its **twenty million** residents from possessing a modern sporting rifle.

65.    "Large capacity ammunition feeding device," similarly, is a politically charged definition designed to place more and more constitutionally protected arms inside the New York Legislature's mercurial list of banned weapons and accessories--and outside the reach of law-abiding citizens. See NYPL Section 265.00(23). The banned "large-capacity" magazines are in fact standard parts that are shipped with the vast majority of firearms manufactured in and imported to the United States.

66.    There is little doubt that New York's pair of statutes penalizing the mere possession of "assault weapons" and "large-capacity magazines" impinges upon conduct protected by the Second Amendment. The Second Circuit has ruled as much in New York State Rifle and Pistol Association, Inc. v. Cuomo, 804 F.3d 242, 255-57 (2nd Cir. 2015) (concluding that "assault weapons" and "large-capacity magazines" are in common use and assuming that they are also typically possessed for lawful purposes).

67.    The Supreme Court has also announced in Heller, 554 U.S. at 582, that "some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications...

12. 13. 14. Crime in the U.S., FBI (2019), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-20.

and the Fourth Amendment applies to modern forms of search...the Second Amendment extends, <u>prima facie</u>, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."

68.     The only remaining question, then, is whether New York's ban on modern sporting rifles and standard-capacity magazines "is consistent with the Nation's historical tradition of firearm regulation." <u>Bruen</u>, 142 S.Ct. at 2126. The short answer is no. Just like New York's may-issue regime for concealed carry that was struck down by <u>Bruen</u>, its strict-liability criminal statutes restricting modern arms are unsupported by the prevailing law of almost all U.S. states. Nor is there any current, analogous federal law limiting the possession of standard semiautomatic rifles with factory-issued magazines.

69.     <u>NYPL Sections 265.02(7), 265.02(8)</u> and their corresponding sentencing provisions within <u>NYPL Section 70.02</u>, on their face, violate the Second Amendment.

### COUNT III:

NYPL SECTIONS 265.04(2), 265.03(2), 265.02(5)(i), 265.02(7), 265.02(8) AND THEIR CORRESPONDING SENTENCING PROVISIONS WITHIN NYPL SECTION 70.02 VIOLATE DUE PROCESS (LACK OF MENS REA)

70.     Plaintiff repeats and re-alleges paragraphs 1 through 69 as if set in full.

71.     New York's gun laws are all the more troubling when examined under Fifth and Fourteenth Amendment lenses. They comprise of strict-liability statutes masquerading as public welfare legislation that attempts to circumvent the Due Process Clause entirely.

72.     Imposing criminal liability on otherwise innocent conduct violates Due Process, particularly where--as here--the criminal

penalties are severe. It is fundamentally unfair to impose criminal punishment on a person engaged in otherwise innocent conduct without proof of intent that converts the innocent conduct into a serious crime. NYPL criminalizes the mere possession of multiple firearms, of a modern sporting rifle, and of a standard-capacity magazine, without requiring any underlying criminal intent or accompanying violence. The statutes' absence of language regarding intent suggests that they lack explicit mens rea requirements. However, "the fact that the statute does not specify any required mental state...does not mean that none exists." Elonis v. United States, 575 U.S. 723, 734 (2015).

73.    In fact, the Supreme Court has long emphasized the importance of scienter when interpreting criminal statutes. As Justice Jackson explained in Morissette v. United States, 342 U.S. 246, 250 (1952):

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

74.    By dispensing with mens rea, New York's scheme essentially invokes strict liability on the possession of multiple firearms, of a modern sporting rifle, or a standard-capacity magazine, and regulate such conduct as public welfare, or regulatory, offenses that are normally designed to protect the public from potentially harmful or injurious items. However, there is a limit to which these so-called public welfare offenses can withstand Due Process scrutiny.

75.    To be specific, when a public welfare statute's silence on mens rea "potentially would impose criminal sanctions on a class of persons whose mental state...makes their actions entirely innocent," the Supreme Court has repeatedly chosen to read a mens rea requirement

into a crime's statutory elements. <u>Staples v. United States</u>, 511 U.S. 600, 614-15 (1994). <u>See</u> <u>e.g.</u>, <u>Rehaif v. United States</u>, 139 S.Ct. 2191 (2019) (holding that in a prosecution under <u>18 U.S.C. Sections 922(g) and 924(a)(2)</u>, the government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm). Indeed, the presumption in favor of scienter is deeply rooted in the established principle that severe criminal penalties are warranted only when a person commits an evil act with an "evil-meaning mind." <u>Morissette</u>, 342 U.S. at 251.

**76.**   The <u>Staples</u> Court recognized that historically, public welfare offenses "almost uniformly involved statutes that provided for only light penalties such as fines or short sentences, not imprisonment in the state penitentiary," and therefore "in a system that generally requires a 'vicious will' to establish a crime, imposing severe punishments for offenses that require no mens rea would seem incongruous." 511 U.S. at 616-17 (citation omitted).

**77.**   The question of mens rea is further elevated by the following curiosities within NYPL. First, the criminal possession, sale, and use of a weapon in the first degree--offenses that involve drastically varying levels of criminal intent and danger to the public--are all classified as B violent felonies that carry the same mandatory sentencing range of five to twenty-five years. <u>See</u> <u>NYPL Sections 265.04, 265.09, 265.13, 70.02</u>.

**78.**   Second, <u>NYPL Section 265.04(1)</u>, the other enumerated offense under criminal possession of a weapon in the first degree, penalizes "the possession of any explosive substance **with intent to use the same unlawfully** against the person or property of another." (emphasis added)

Bizarrely, New York legislators chose to invoke strict liability when regulating firearms rather than explosives. These inconsistencies further illustrate just how incompatible New York's gun laws are with the Due Process Clause.

79.     NYPL Sections 265.04(2), 265.03(2), 265.02(5)(i), 265.02(7), 265.02(8) and their corresponding sentencing provisions within NYPL Section 70.02 do not comport with the established framework for interpretation of mens rea requirements in criminal law and, as a result, are facially unconstitutional under the Due Process Clause of the Fifth and Fourteenth Amendments.

## COUNT IV:
### NYPL SECTIONS 265.04(2), 265.03(2), 265.02(5)(i), 265.02(7), 265.02(8) AND THEIR CORRESPONDING SENTENCING PROVISIONS WITHIN NYPL SECTION 70.02 VIOLATE DUE PROCESS (VOID-FOR-VAGUENESS)

80.     Plaintiff repeats and re-alleges paragraphs 1 through 79 as if set in full.

81.     The government violates the Due Process Clause by "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." Johnson v. United States, 576 U.S. 591, 595 (2015). The lack of clarity inherent in New York's statutes severely punishing the mere possession of certain firearms implicates both principles.

82.     The void-for-vagueness doctrine applies "not only to statutes defining elements of crimes, but also to statutes fixing sentences." Id. at 596. New York's strict-liability gun laws trigger severe mandatory penalties for the mere possession of multiple firearms, of a modern sporting rifle, or of a standard-capacity magazine. Such

mandatory sentencing laws raise heightened constitutional concerns and require greater notice than non-mandatory provisions. See e.g., Cuomo, 804 F.3d at 265 ("Statutes carrying criminal penalties or implicating the exercise of constitutional rights, like the ones at issue here, are subject to a more stringent vagueness standard than are civil or economic regulations.") (citation omitted). New York's firearm scheme also gives judges broader-than-necessary discretion when prescribing sentences. In the case of the mere possession of ten firearms, a New York judge has no statutory guidance whatsoever on how to pick a number between five and twenty-five years—the mandatory sentencing range for such an offense.

83.    As a result, under NYPL, parties can only guess whether a conviction of criminal possession of a weapon in the first degree will expose a defendant to five, ten, or twenty years in state prison. If an attorney guesses wrong, the consequences for the defendant are enormous. State judges, on the other hand, are given free rein to fix sentences based on their political ideologies and future electability rather than on the law or the facts. Such guesswork and speculation caused by the vague text of New York's scheme plainly preclude the fair notice and equitable enforcement that the Constitution demands.

84.    Moreover, the categorization of the mere possession of certain types or quantities of firearms as violent crimes also rises to the level of unconstitutional vagueness. For starters, NYPL offers no criteria of any sort for how a "violent felony offense" is defined. Instead, New York arbitrarily includes the mere possession of multiple firearms, of a modern sporting rifle, and of a standard-capacity magazine in its list of violent crimes. See NYPL Section 70.02(1). The mere possession of ten or more firearms, for example, is equated

to first-degree manslaughter and first-degree rape, carrying identical terms of mandatory imprisonment. NYPL Section 70.02(1)(a).

85.    The mere possession of normal firearms that are in common use for lawful purposes such as semiautomatic handguns or rifles, without any additional intent to use them in a dangerous or criminal manner, is not a crime of violence by any stretch of the imagination or by established legal standards.

86.    The range of conduct that could constitute knowing possession of firearms can vary on a scale of risk of danger to others, but the mere possession of weapons does not have to involve any risk. For example, brandishing a firearm, loading it, or actually pulling the trigger are all highly dangerous activities. But those separate actions go beyond the mere possession of weapons. Something as simple as keeping ten firearms under your bed--a relatively passive and not inherently violent act--is all that it takes to potentially go to prison for twenty-five years in New York. Similarly, possessing a single modern sporting rifle could land you in jail for up to seven years. NYPL Section 70.02(3).

87.    In examining whether a conviction under a particular state statute is a violent felony, the Supreme Court has generally relied on the elements of the offense and the specific conduct required to violate the statute, not speculation about what additional conduct may occur. See Descamps v. United States, 570 U.S. 254, 261 (2013) ("The key...is elements not facts."). The Supreme Court has also recognized the significant difference between possessing and using something, even something potentially dangerous such as a firearm. In Bailey v. United States, 516 U.S. 137 (1995), the Court ruled that the "use" of a firearm in relation to drug trafficking requires evidence of "active

employment" of the firearm by the defendant.

88.     A comparison between New York's firearm scheme and its federal counterpart fixing sentences for unlawful firearm possession reveals more problems. Unlike New York's vague provisions, U.S.S.G. Section 2K2.1 takes into account the myriad circumstances surrounding unlawful firearm possession and prescribes sentences accordingly. For example, the unlawful possession of ten firearms, as opposed to three, is given a two-point increase in offense level, resulting in only months of additional incarceration in most cases. See U.S.S.G. Sections 2K2.1 (b)(1)(A), (b)(1)(B); Ch.5 Pt.A. New York's scheme treats the possession of three firearms, and that of ten, categorically differently. The former is a class D violent offense subject to a maximum mandatory sentence of seven years. The latter is a class B violent felony punishable by up to twenty-five years of imprisonment. NYPL Section 70.02.

89.     Furthermore, U.S.S.G. Section 2K2.1(b)(2) prescribes an offense level of six for a defendant who possessed firearms and ammunition—regardless of quantity—for lawful sporting purposes or collection only. For a defendant with no criminal history, the corresponding prison term is zero to six months. U.S.S.G. Ch.5 Pt.A. New York's scheme does not account for such mitigating factors and authorizes a maximum mandatory sentence of twenty-five years, a 5000% variance, for the same conduct.

90.     NYPL Sections 265.04(2), 265.03(2), 265.02(5)(i), 265.02(7), 265.02(8) and their corresponding sentencing provisions within NYPL Section 70.02 are facially void for vagueness because they fail to give fair notice, because they encourage arbitrary enforcement, and because they constrain separation of powers.

## COUNT V:

### NYPL SECTION 265.01(5) VIOLATES
### THE SECOND AMENDMENT AND EQUAL PROTECTION

91.    Plaintiff repeats and re-alleges paragraphs 1 through 90 as if set in full.

92.    The Second Amendment extends the right to keep and bear arms to "the people." U.S. Const. Amend. II. By guaranteeing the right to "the people" generally--something that is equally true of other individual rights that the Constitution protects, such as those secured by the First, Fourth, and Ninth Amendments--the Framers made the choice to grant that right to every person included in "the people." Any effort at excluding one or more classes of persons from keeping and bearing arms must therefore be based on something that distinguishes them from "the people."

93.    When it comes to constitutional provisions protecting a private right rather than a public good, the Supreme Court has unequivocally interpreted "the people" in the Constitution's text to encompass resident aliens. See e.g., Bridges v. Wixon, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."); Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens."); Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n.5 (1953) ("Once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders.").

94.    New York State has no legitimate government interest or rational basis in barring non-U.S. citizens from firearm possession. There is no evidence to suggest that aliens--let alone those who are lawfully present in the United States--commit more firearm-related

crimes than natural born or naturalized U.S. citizens. Even though the regulation of aliens in this nation is a largely federal affair, no federal law requires United States citizenship as a prerequisite for purchasing, possessing, transporting, or carrying a firearm.

95.    The Second and Fourteenth Amendments guarantee the right of all people to keep and bear arms in their own defense, but it is particularly empowering for members of minority groups. When majority institutions fail to protect them--as demonstrated by the authorities' lack of success in curbing hate crimes against Asian and Pacific Americans during the ongoing COVID-19 pandemic--minority individuals must often serve as the first and last line of defense for themselves, their families, and their communities. The right to keep and bear arms enables them to be effective in that role.

96.    This desire--indeed, need--for self-protection is felt even more acutely by members of the Asian community who do not yet have U.S. citizenship or permanent residency, as their immigration status (or lack thereof) is often associated with increased levels of discrimination and bigotry. As a self-proclaimed Sanctuary State with seemingly friendly policies toward immigrants, New York's statutory bar on lawfully present aliens from exercising their core Second Amendment right to keep and bear firearms for self-protection is the height of hypocricy.

97.    NYPL Section 265.01(5) violates the Second Amendment and Equal Protection because it prevents lawfully present, law-abiding aliens from possessing a firearm.

## ON ALL COUNTS

98.    Plaintiff repeats and re-alleges paragraphs 1 through 97 as if set in full.

99. As the foregoing shows, New York's gun laws at issue are full of constitutional holes that they make a Swiss cheese look solid.

100. Although this Court should not lightly declare state statutes unconstitutional, there is no alternative. The New York Penal Law sections imposing strict criminal liability and penalty on the mere possession of multiple firearms, of a modern sporting rifle, and of a standard-capacity magazine plainly violate the Second Amendment, the established mens rea requirement in criminal law, and the void-for-vagueness doctrine. New York's statutory bar on non-U.S. citizens from possessing any firearms plainly violates the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment.

101. The challenged statutes are facially unconstitutional because no set of circumstances exists under which they would be valid. But if the Court disagrees, it should invoke the rule of lenity to resolve any ambiguity in Plaintiff's favor, whose life, liberty, and property are at stake.

102. There is no adequate remedy at law to redress the ongoing deprivation of Plaintiff's constitutional rights other than this Court's favorable judgment.


<u>**RELIEF SOUGHT**</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

(i)     ASSUME jurisdiction over this matter;

(ii)    STAY Plaintiff's state criminal proceeding and RELEASE him from Defendants' custody, pending disposition of the instant case;

(iii)   DECLARE that <u>NYPL Sections 265.04(2), 265.03(2), 265.02(5)(i), 265.02(7), 265.02(8)</u> and their corresponding sentencing

provisions within NYPL Section 70.02 are unconstitutional on their face and violate the Second, Fifth, and Fourteenth Amendments to the United States Constitution;

(iv)    DECLARE that NYPL Section 265.01(5) is unconstitutional on its face and violates the Second and Fourteenth Amendments to the United States Constitution;

(v)    ENJOIN Defendants from enforcing NYPL Sections 265.04(2), 265.03(2), 265.02(5)(i), 265.02(7), 265.02(8) and 265.01(5) against Plaintiff and all similarly situated persons;

(vi)    GRANT such further relief as the Court deems just and proper.


Dated:   Valhalla, New York
         March 30, 2023

Respectfully submitted,

Jianqiao Lu, pro se
Plaintiff

WCDOC #265008
PO Box 10
Valhalla, NY 10595-0010

31

LU v. ROCAH, 7:22-CV-9715 (NSR)

FILING # 1:

AMENDED COMPLAINT AND PETITION
FOR WRIT OF HABEAS CORPUS

PLEASE SCAN AND FILE ON ECF



RECEIVED

MAR 3 1 2023

PRO SE OFFICE

VIA COURIER

PRO SE INTAKE UNIT
CHARLES L BRIEANT JR COURTHOUSE
300 QUARROPAS ST
WHITE PLAINS NY 10601-4150